et al. On behalf of the Avalon, Mr. Patrick Flaherty, and on behalf of all the Avalonians, Mr. William Cunningham will be addressing the floor. Thank you. Good morning, Counsel. Mr. Flaherty? Yes. Good morning. May it please the Court, Mr. Conrades, Counsel, there isn't anyone in this room, including the distinguished members of this Court, who know why Juror Susan Straufferman was upset on that spring day, almost exactly two years ago today. And anyone who says that they do know is guessing. Mr. Flaherty, let me just interject briefly. Did she ever suggest or allude to any reason why she was upset? None. None. None. It was a highly emotional case, was it not? Indeed it was. Indeed it was. Did she ever signal to the deputy or to anyone else that the jury was deadlocked and she couldn't go on because they were deadlocked? No, she didn't do that. But if I may, the questions you're asking, I think, are impermissible questions for me to address at this stage of the game, because the case law doesn't allow an affidavit to go into those matters. And that underscores the fundamental problem that we have with this case, which is that the Court didn't ask when it had an opportunity to ask. It didn't inquire at the precise moment in time and the only moment in time when it could have inquired.  But to go on, Your Honors, anyone who says that the distress was the result of the deliberative process and not the result of duress or coercion is also guessing. We don't know the cause of her distress because no one asked. We can't rule out duress or coercion because the Court failed to investigate. That's the fatal flaw in this verdict. That's why a new trial is required. Now, you rely heavily on the Lowe case, correct? I'm so sorry. I thought I turned this off. I'm so sorry. I'm sorry. Go ahead, Your Honor. You rely heavily on the Lowe case, but the facts in Lowe are quite different. In Lowe, there was really a juror who was hysterical. Indeed, the Court discharged that juror, and we don't have that situation. Indeed, the juror here was able to go on and deliberate at least another four hours when the jury was polled. She responded in the same manner as the other jurors. So we really don't have the Lowe situation. I think we have the core facts in Lowe are present here, Your Honor. We had a juror who was visibly upset, a juror who was crying, a juror who told the bailiff she couldn't continue. That information is communicated to the Court, and it happened during deliberations. That's the key timing of this, that it all happened during deliberations. The Court was told about that circumstance, much like the Court was told in Lowe. The degree of the emotional distress, I think, is irrelevant to the principle that's at stake here. It doesn't matter whether she was a little distressed or a lot distressed. The fact is that she was distressed during deliberations, and the law, I believe, and Lowe specifically imposes a duty on the trial court when that fact is discovered, and it isn't often discovered. But when it is discovered, the Court has an obligation to ask why and to make sure that that distress, big or small, wasn't the result of coercion, wasn't the result of duress, internal coercion or internal duress. I think probably we would agree that, generally speaking, when that circumstance arises, the recommended procedure is for the trial court to go on the record, bring counsel into open court, raise the matter with counsel, get input from counsel, and go from there. Let's assume that that was error for the Court not to do what you suggest. Does that automatically mandate a reversal, or is there a prejudice component in here? No, Lowe does not impose a prejudice component. Lowe has nothing to do with prejudice because it arose during the course of deliberations. I believe Lowe stands for the proposition that you have to err on the side of caution and investigate and make sure, to the extent you are capable of making sure in these circumstances, that you have to at least ask that juror, what is the source of your distress? Why is this happening? And once the Court is sure that it's not duress or coercion, then things can be continued as they were. But isn't this case really governed by Wolfe v. Menard, which does talk about an aggrieved party's responsibility to first raise the probability of prejudice resulting from an unauthorized ex parte communication? With all due respect, Your Honor, I think that Wolfe has absolutely nothing to do with this case. Wolfe isn't a juror deliberation case, and I think that the... Excuse me, it's not a juror deliberation case? Wolfe v. Menard is the case where the judge went into the jury room during deliberations and answered a question for the jury with regard to a particular issue of apportionment of damages. Yeah, but Wolfe has nothing to do with our case because in Wolfe the judge specifically was the actor. The judge was the person who precipitated the problem by entering the jury room. We don't know what the problem was in Conrad's. We don't know what happened here. We don't know why the judge was upset, and that's why this case is controlled by Lowe because in Lowe it was also undetermined. You didn't say the juror was upset, you said the judge was upset. I'm sorry, in Wolfe it was the judge who precipitated the problem by entering the jury room without the knowledge and the awareness of the other parties. In Lowe we don't have that circumstance. We don't know why, like this case, we don't know why the juror in Lowe was distressed. We only know that she was, and what Lowe held is that when you know she is and you don't know the cause, you have to ask. And the failure to ask in Lowe all by itself without evidence of prejudice, the failure to act by itself is reversible error because you have to be sure that it wasn't the result of duress or coercion, and the court in Lowe didn't do that. But wasn't that with regard to whether or not that juror should have been discharged? It was, but to me, Your Honor, it has nothing to do with whether the juror stays or whether the juror leaves. The principle is exactly the same. The court has to be sure that the integrity of the deliberative process is safeguarded, is maintained. The court didn't do that in Lowe because it dismissed the juror without asking. It certainly has to be at least as egregious, at least as egregious, to keep a juror and not ask as it is to dismiss a juror and not ask. This case is the flip side of Lowe. In Lowe's, it was a defense, it was a plaintiff's verdict that was being challenged by the defense because a juror was let go without asking. In this case, it's a defense verdict being challenged by the plaintiff where the juror was kept, but they didn't ask about the cause or the underlying ideology of the distress. It's exactly the flip side of Lowe. But the core facts, I think the operative facts, that make this case controlled by Lowe are the simple proposition that in both cases, the jurors were distressed. In both cases, the distress occurred during deliberations. In both cases, the cause of that distress was unknown. And in both cases, nobody asked why. And when those circumstances develop, when those circumstances occur, I believe Lowe is imposing an obligation on the court to inquire. She had a ticket to deliberate for another four hours, correct? They did. Indeed, they did. But she never signaled to the deputy or to the court that she had an issue, correct? No. Once being rejected, once being invalidated, once being rejected, once being invalidated, she didn't come back and say it again. How about when she was questioned in front of all of the other jurors, was this a misdiscounted verdict? She was in the same group if there was duress. And that's the assumption we have to operate under, Your Honor. There can be no requirement here that we have to prove duress when the court never made the investigation. That can't be the rule. If that's the rule, it will never be proven because the court didn't take the step at the time it needed to be taken to provide that proof. So with respect to the polling issue, there's a number of reasons, in my opinion, why polling does not cure or remedy this problem, not the least of which is that that polling occurred within minutes of the verdict having been reached. If there was, in fact, duress, this juror was now within the same group, in the same presence, and under the same influence of that group that had produced the verdict, the coerced or duressed verdict in the first place. It simply isn't reasonable to think that she would, a few minutes later, under the influence of the same people, now change her mind. Generally speaking, when you talk about duress, you're implying that duress is coming from the other jurors? What are we talking about? Duress can be internal. It can be external. I think if you look at the cases cited in Lowe, the California cases, they're specifically suggesting it was internal duress that they were dealing with in the California cases. So it can't be either. It can be outside or it can be inside. So isn't generally what goes on within the jury room considered sacrosanct? We don't really get into what happens in the confines of a jury room, do we? You don't post verdict. You absolutely don't post verdict. And I believe that that is the rule, and I believe that's a sound rule. What I'm saying here, Your Honors, is that this court had an opportunity at the only time it could have had the opportunity to ask, and it didn't do it. Now, you also argue that the court's failure to do this, really, was an error of almost constitutional magnitude, affecting the defendant's right to a jury trial, to a fair trial. Now, you really don't cite any authority for this aspect of your argument, and I would like to ask, doesn't the more recent or most recent Supreme Court case from October 2010, the Johnson case, really speak to this issue and, in fact, hold otherwise? Didn't our Supreme Court in Johnson indicate, and they refer to the Childs case, which you rely on, they say, in fact, as we explained in Childs, an ex parte communication now serves as grounds for a new trial only if it results in injury or prejudice to the defendant, citing Childs, C. Elsa McDonald. And they conclude that paragraph by saying, simply put, a non-prejudicial ex parte communication is insufficient to impact the fairness of a defendant's trial. Your Honor, with all due respect, this is not an ex parte case. The issue that I'm arguing before the court, and the issue that I think is the most fundamental one before this court, doesn't have to do with ex parte communication. We have raised that issue. That's a separate argument. Whether or not the court's communication with the juror by itself was reversible error, that's a separate issue. Well, this is the issue I was addressing, then. It is a separate issue. It is. Yet you argue it. Well, I do argue it, Your Honor. And the point that I think is the most fundamental point here is that the court failed to investigate distress. That issue, the failure of the court to investigate distress, whether or not the court had a duty to do so under these facts, is not an ex parte issue. It's not a Johnson issue. It has nothing to do with proving prejudice or the consequences of the ex parte conduct. That's an entirely separate issue. I do believe that Johnson, to answer your more specific question, I do believe that Johnson does impose a higher burden to prove prejudice. But Johnson also was a criminal case involving the very complicated, to me as a civil lawyer, the very complicated post-decree or post-judgment procedures that are available where issues hadn't been raised originally. And when finally raised in these post-judgment procedures, a higher duty is imposed in those contexts. So I think Johnson, even on that issue, is distinguishable from this case. But I don't want there to be any confusion about the core issue that I think requires the reversal in this case, and that is it was simply the failure to investigate when there was no, and that's the other distinguishing factor, there was no juror distress. In many instances, we have no idea what goes on behind the scene in these jury deliberations. But when we do know, when there are those rare opportunities where that surfaces, I think the law then imposes this duty that the law imposes. And the constitutional basis for that duty, I do believe, lies in the right to trial by jury. I think that if we don't impose this requirement, then the right to trial by jury has no meaning whatsoever. Mr. Fleury, what about the second issue you raised about the trial court's ex-party communication requires reversal? That sort of segues into the next point. What's your position on that? My position is that it does. I think that under the Child's case, I don't believe we have to prove prejudice. I do with all due respect. I don't believe that Johnson overrules Child's on this point. Johnson, as I said, was in a criminal context and involved the post-judgment hurdles that have to be jumped when the issues weren't raised originally, and a higher burden is then imposed. I think the Child simply says, and I think Child's imposes the fair rule with respect to ex-party communication, which is that if the absence of prejudice is not clearly apparent, then it's reversible. Now, in Child's, it was a criminal case. Doesn't it implicate the defendant's right to be present and the right to counsel being implicated? Isn't it different than a civil case? It clearly is different, and there's no question that the law affords a greater degree of protection for those rights in the criminal context than I think they do in the civil context. I certainly concede that. However, I would argue, Judge, that it's no less important in this context because this goes to the fundamental value of the right to trial by jury, doesn't it? We're talking about the integrity of the deliberative process and that the right to trial by jury means nothing if it doesn't include jury deliberations that are free of duress or coercion. Thank you. Excuse me. You'll have time on the final counsel. Mr. Cunningham. Please, the Court. Good morning. I am speaking on behalf of all the defendants and I would like to thank Ms. Carey, Mr. Fuhrer, and Mr. John Nagin perhaps more than anybody because he's giving up the opportunity      Good morning. Mr. Cunningham. Good morning. Mr. Cunningham. Good morning. I'm not going to say it, but I thank them for their trust. Your Honors, I think this case comes down to one question that was answered on the day of the verdict by Mary Stafford. Was this then and is this now your verdict? And the answer was yes. And as the Epps case said, involving exactly the similar circumstance, her verbal response, yes, is unambiguous. That's what we have here. The verbal response, yes, is unambiguous. That's found in our brief citation that can easily be found. Everything else that the plaintiff has suggested here is ambiguous, but that answer is not. What it does is it renders all questions raised by the plaintiff moot. This was the opportunity that jurors get to say in front of the judge, in front of when the parties are there, the jurors are there, and to say, you know, I'm bothered by this. Maybe there is some duress. Let that be known. Coercion. They're asked individually that question. Well, let's just stop and ponder that for a second. The answer is, was this then and is this now your verdict? The answer could, in reality, in all truth, be yes. What about if there was something going on? Let's assume for an extreme case, the juror was assaulted by somebody in the jury room. You're saying by answering the polling, that puts outside the parameters of any potential inquiry, no matter what happened in the jury room. Is that what you're suggesting? What I'm suggesting is that in this particular case, we certainly don't know of anything, and to go into imaginings as to what might have happened or what could have happened, certainly there's no evidence of any assault in this particular case. We have jurors who were not shy about asking questions. They came out with many questions to the judge throughout the two days of deliberations. Mr. Cunningham, wouldn't it have been just as easy for Judge Spence to put any question to rest by just calling the attorneys and saying, this juror has a question, or bringing the juror out into the courtroom with all of the lawyers present and saying, go ahead, tell us what's the problem? Wouldn't that have just put this all to rest? Isn't that the proper thing to do? That would have been nice, and it may have been something that could have been done in this particular case, but we do have a hint in this particular case as to what would have happened had the judge gone ahead and done that. Because what he told, the answer that he gave to the question was, go ahead and do the best that you can. If he had brought that to the attention of the jurors and said, this is what I'm intending to do, certainly that would have been at his discretion to do that, regardless of what the attorney said, if he felt that was the proper thing to do. And having done that, what would have happened? Four hours of deliberation and the same result that we have. Was there ever any indication that you know of that this jury was deadlocked at this point and counsel on the other side is indicating why they didn't give a criminal instruction? There is no indication of that whatsoever of any kind that I'm aware of. And I think the only reason that he does that is so that in his brief he could cite the language of the IPI language that talks about the fact of calling in the attorneys. I think that's really the basis why he cited that. But there is no indication whatsoever that there was any kind of a deadlock. This was an emotional case. It involved 24 witnesses over three weeks. It involved, as Judge Spence mentioned, children losing their mother and coming in and testifying, tears being shed. So there certainly was an emotional aspect to this case. And this juror, as Judge Spence indicated, was someone who took copious notes. She is someone who, according to him, she did more notes than any other juror during the trial. She had pages and pages of notes. If I remember correctly, she went through several notebooks. She took her job very, very seriously. She was very intense about it. This is the words of the judge who saw this juror throughout the case. And so we do have an indication of the impact that this was having on this particular juror and how serious she was taking it. You seem to be seated. Counsel, opposing counsel believes this case is really governed by Lowe as opposed to Wolfe v. Minard. Would you address that point, please? I think that Lowe really is a case that is easily distinguished. If it says anything at all with regard to this case, it would say that if Judge Spence wanted to discharge this juror, that at that point in time, and remember in that particular case the words of the opinion are this is a very bizarre, unusual circumstance, which it certainly appeared to be, that at that point in time if you're going to take some steps to actually discharge the juror, then you better make a better record of it. But if you're telling this juror go ahead and do the best that you can, go back and deliberate with your fellow jurors, I don't think that that same standard applies, nor should it apply. The logical conclusion, extension of what he's arguing, is that the judge should be sitting in with the jurors during deliberation to make sure there's no coercion, no anything. That's not anything that we've ever wanted to do or ever suggested should occur. Well, let's talk about ex parte communication, though. Is the judge or the deputy, if you will, ever to have a communication with the jurors outside the presence of the attorneys in the case? Well, ideally there should be none, and Bailiff is there for the comfort of the juror. Ms. Bailiff, I think, did her job because she noticed something, the juror said something, she brought it to the attention of the court, and the court responded to it. Should the court have responded to it? I think that in that situation the court may not have, it would have been perfectly correct not to respond to it at all, but having the bailiff come to him and say, I told the bailiff I would tell you about this, I think then the judge's response was certainly not something that created reversible error in a case like this. So you're saying, assuming that the judge did the wrong thing, must he show prejudice? I believe that there has to be some prejudice shown here in some way, shape, or form. A mere possibility that something, that there might be, and that's really all I'm suggesting, that the merest possibility of something, it requires a reversal in a case like this. That's, I don't believe that that should be the why. So the essence of your position is, if I can pull this out clearly, is look, you're not saying that what the trial judge did was proper. We can all agree that generally speaking you should call in the attorneys and make a record. You're saying even if that is the case, there was no prejudice, things ended up in the same way, same place anyway. Exactly. In fact, I think that what we have is a situation here where if you take it to its logical conclusion, and as I say, we don't have a hint here what the judge would have done having brought this to the attention would have been to say, this is what she said. One of the things that might have been raised before the judge would be, well, judge, there's no question. There's really nothing to respond to. Your suggestion, tell her to do the best she can, it sounds like the best one that could happen. What about the response to Mr. Flaherty's rhetorical question is, you know, we have to be concerned about the integrity of the deliberative process. If we just ignore, if the trial judge can just ignore this and just go on, doesn't that impact adversely on the integrity of the deliberative process? How would you ever know what's going on and whether or not there's some improper influence in the jury room? Well, that would require that all jury deliberations be taped and video cameras. If the juror says they're in distress, he seems to be suggesting it's not something you should simply ignore. Well, and this juror, I think what we have in this particular case is a situation where this juror was apparently exercising his crime and was expressing some distress. And what we have then is how do we handle that situation? I think that Judge Spence, having to do it over again, would probably do something a little differently, express that in the opinion. But the real crux of the question is, is there anything here that would mandate a reversal? And there simply is not enough. Just the mere possibility is not enough. There has to be something else, and we just don't see evidence of it here. Now, if we look at this in the context of an ex parte communication, is there a requirement that that communication be related to a crucial issue in the case? I think that that certainly would be a real important factor because one of the things we have to look at in this case is the question that what the judge actually said. Bear with it and see what you can do. The words from Judge Spence certainly can't be said to be calculated to influence the outcome of the jury. Or prejudicial words favoring one side or the other. And we have the Supreme Court in Redmond that says that the Illinois law is clear on the subject of the use of juror testimony or affidavits for the purpose of impeaching a verdict. Juror testimony or affidavits will not be admitted to show the motive, method, or process by which the jury reached its verdict. But may be offered as proof of the existence of improper extraneous influences on the jury. So the Supreme Court here is saying in Johnson, the 2005 case, that the only way the thing that this could be used for is offered for proof of the existence of improper extraneous influences on the jury. And those words, if you examine the words that were given, cannot be said to be in any way an extraneous influence on the jury. And if that's the case, then according to this, the Redmond case, then this affidavit falls, should be stricken, and really the appeal is over. Because that's what this whole appeal is based on, is that affidavit. A few more things about Judge Spence's observations. Basically, what he said was in the time of the post-trial motion, he said, I think that her emotions were part of the deliberative process. Again, that's something you as the justices in this case looking at it have to take into account, is what the judge at the time observed. And this was his observation, given the indication that she was very intense, he took her job very seriously, and that her emotions were part of the deliberative process. Which certainly is understandable. This is a difficult job, at least I try to tell the jurors that in the jury selection process, in the opening statement and closing remarks. This is a difficult job that you do. It's a sacrifice we ask you to make, but it is a difficult job. And some people are going to take it more seriously, and some people are going to show some emotion. There's nothing wrong with that. So you're saying the extent of the judge's obligation in coming to the conclusion that the juror's distress was part of the deliberative process was only his visual observations, rather than the obligation to go ahead and question her about why the tears? I think that if you mandate that judges in this situation have to go and do a full hearing every time some juror cries, then you're asking for creating more problems than are evident in this particular case. I think that that would be a very difficult rule for any trial judge to follow. Your opponent talks about internal duress, and some California cases have talked about internal duress. As you say, Mr. Cunningham, in most juror cases, these are individuals who are coming into a system that they're not familiar with and hearing cases that they probably never wanted to hear in their lives. Wouldn't you submit that most people have some internal duress when they're sitting on a jury? I would hope that jurors have internal duress about cases that they are taking it seriously. Otherwise, you know, I've been doing this for a long time, and I'm a great believer in the jury system. And I believe that the jurors that I've been before take their oaths seriously. And I try to remind them of that in closing argument, to take their oath seriously. Find that in my closing argument in this case. It's the last thing I say to them. Be fair to yourselves and the oath that you took as jurors. That's all I ask. And I think that that's what this juror did. Thank you very much, Counsel. Mr. Flannery. Thanks, Judge. A couple of quick things, Your Honor. With respect to Wolfe, Wolfe is an ex parte communication case. Wolfe has to do with the second issue I raised in my brief. It has absolutely nothing to do with what I believe to be the core issue that's before you. Another point, Your Honors. The absence of evidence of prejudice can't be the standard. When the issue before the court is whether the trial judge's failure to inquire about deliberative distress is reversible error or not. It can't be the standard because the judicial error is the failure to ask. Judicial error can't be affirmed because of insufficient proof when it is the error itself that prevents the creation of the proof. But don't you have to show that the results would have been different or how the results would have been different? I mean, in the case that we have here versus the Lowe case. In the Lowe case, the juror was hysterical. And it seems to me that in this case, she was crying and she wasn't hysterical. She was emotional, which sounds like it's not unusual for the facts of this case. So how is it that whether Judge Spence went and spoke to her or whether he said just do your best, how is it going to be any different? I don't think you have to show that it would have been different. I think the principle that Lowe enunciates is that you have to ask why the juror is in distress. And you have to ask because the principle at stake is so important. It turns on whether or not that distress is from the deliberative process and therefore normal or whether that distress is in fact from a corruption of the system. Is it from duress or coercion? And we can't assume which way it is unless we ask. I think Lowe imposes that duty. Lowe simply says the principle we seek to validate here is so important and the burden of inquiry is so minimal that we have to do it. And if you don't do it, ladies and gentlemen, if you don't do that, you never know whether that duress, that distress was the result of duress or whether it in fact was the result of the deliberative process because you're only guessing. A couple of quick things with respect to Poling. I think Poling is a red herring here. Poling only asks whether you cast that vote. That's all that Poling asks. It doesn't ask whether you were coerced to do so or whether you were under duress when you did so. It simply says is that your vote? Well, by implication, doesn't it ask if you were under duress? Is this now and was this your verdict? I don't think to a group of ordinary lay people in that context, Your Honor, that that's a very sophisticated suggestion that you're making. And I don't think it's realistic. I'm talking about what I think is realistic for ordinary people. I don't think that's realistic to attribute to them this very subtle distinction between we're not only asking you whether you cast that vote. We're asking you whether or not you were free to cast that vote. We can ask that question, and we should have asked that question in this case, but it wasn't asked. So, no, I don't believe the Poling question as submitted accomplishes what the court would like to suggest at this point. But the other point is this, that the failure to rule out duress or coercion at the time the distress was first reported can't be remedied by a Poling response that itself could be the product of duress or coercion. Remember, she's in the group, in the presence of the same group that probably produced the duress or coercion in the first place. But maybe even more fundamentally, is this judge why Poling fails in this case? Why we can't say that that cures this defect? Because the court's response to Juror Straufferman was a rejection of her feelings. It was a rejection of her distress. And it was a validation, in her mind, of whatever it was that was going on in that jury room that produced the distress. And to then expect that juror, that very simple person, to come into this court within minutes of the verdict, having been rejected by the court and invalidated by the court, and all of a sudden interpret this very simple question that's being asked of her in a poll, and to stand up at that point and say, no, it wasn't mine, if she actually understood that that's what the question was, to expect her to do that under this circumstance with that history, I think is not realistic. And I think, finally, ladies and gentlemen, that the value we protect by imposing this duty of inquiry justice is too important to leave to the ambiguity and the vagary of this Poling response. Thank you very much. Thank you very much. Thank you, counsel. At this time, the court will take the matter under advisement and render a decision in due course.